# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

RAMON DIEZ BARROSO, an individual, PEGASO TELEVISION CORP., a foreign corporation, and EMILIO BRAUN, an individual,

Plaintiffs,

v.

VASALLO TV GROUP LLC, a Florida limited liability company, and CARIBEVISION TV NETWORK, LLC, a Delaware limited liability company,

Defendants.

C.A. No. 2025-0480-LWW

## MEMORANDUM OPINION

Date Submitted: August 26, 2025
Date Decided: October 10, 2025

Richard L. Renck & Michael B. Gonen, DUANE MORRIS LLP, Wilmington, Delaware; *Attorneys for Plaintiffs Ramon Diez Barroso, Pegaso Television Corp., and Emilio Braun*

William E. Gamgort & Carmella L. Cinaglia, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Attorneys for Defendants Vasallo TV Group LLC and Caribevision TV Network, LLC*

**WILL, Vice Chancellor**

This is a control dispute regarding Caribevision TV Network, LLC. The plaintiffs hold a supermajority of Caribevision's membership interests. The defendant is a minority member.

In April, the plaintiffs purported to appoint managers to Caribevision's management committee, who then removed the CEO. The plaintiffs assert that their actions were authorized under Caribevision's LLC agreement. The defendant insists that the actions are invalid.

Resolving the dispute centers on three points: the operative version of the LLC agreement, the proper procedure to appoint managers, and the validity of acts taken at the April meeting. The first two issues are resolved in the plaintiffs' favor. The third, however, supports the defendant.

## I.    FACTUAL BACKGROUND

The following facts were stipulated to by the parties or found by a preponderance of the evidence at trial.[1]

### A.    Caribevision and Its LLC Agreement

Caribevision TV Network LLC (the "Company") is a Delaware limited liability company headquartered in Florida.[2] The Company historically operated a

---

[1] *See* Joint Pre-trial Stipulation and Order (Dkt. 51) ("PTO"). The trial record includes 37 joint exhibits, two deposition transcripts, and the testimony of two fact witnesses. Joint exhibits are cited as "JX __." Joint Trial Ex. List (Dkt. 50). Trial testimony is cited as "[Witness] Tr. __." Trial Tr. of July 17, 2025 (Dkt. 59).

[2] PTO ¶ 4.

Spanish-language television network in South Florida and Puerto Rico.[3] The network's stations aired live daily news and entertainment programming to over 12 million viewers, making up the largest independent Spanish-language television conglomerate based in the United States.[4]

In 2008, plaintiff Pegaso Television Corp. ("Pegaso TV") and non-party Barba Television Co. ("Barba TV") executed an Amended and Restated Operating Agreement (the "2008 LLC Agreement") for the Company.[5] At the time, Pegaso TV and Barba TV were the Company's only members.

## B. Pre-Bankruptcy Events

After the 2008 LLC Agreement was in place, Pegaso TV purportedly sidelined Barba TV and entered a joint venture with another media figure.[6] Barba TV was succeeded by defendant Vasallo TV Group, LLC ("Vasallo TV")—a Florida limited liability company owned by Carlos Vasallo.[7] In 2010, Vasallo TV sued Pegaso TV, Emilio Braun, and Ramon Diez Barroso (the "Pegaso Equity Holders")

---

[3] *Id.* ¶ 7; JX 30 at 96. The licenses for the television stations are held by Caribevision Holdings, Inc. PTO ¶ 8; JX 30 at 96.

[4] PTO ¶ 9.

[5] JX 1 ("2008 LLC Agreement"); *see id.* at 24-25 (signature pages); PTO ¶ 10; Calles Tr. 34.

[6] Felipe Tr. 128-30.

[7] PTO ¶ 5; Felipe Tr. 130-32. Vasallo is a citizen of Spain. PTO ¶ 6.

in Florida.[8]  Braun is the nephew of Alejandro Burillo, the head of Pegaso TV.[9] Barroso is also affiliated with Pegaso TV.[10]

The litigation was resolved in 2012 through a Universal Settlement Agreement (the "2012 Settlement Agreement").[11]  Under the 2012 Settlement Agreement, Vasallo would take over management of the Company as CEO.[12]  If Vasallo were terminated without "Just Cause," he gained a put option to sell his interest back to the Company.[13]

### C. The 2019 LLC Agreement

As of early 2019, the Company and its subsidiaries planned to reorganize through a Chapter 11 bankruptcy proceeding.[14]  Bankruptcy counsel requested copies of the Company's corporate governance documents to prepare.[15]  Marcell Felipe—longtime counsel to the Company and Vasallo TV—tracked down the

---

[8] *See* Felipe Tr. 130-31; JX 2.

[9] Calles Tr. 13; Felipe Tr. 126, 218-20.

[10] Felipe Tr. 218-20.

[11] JX 2 ("2012 Settlement Agreement").

[12] *Id.* § 2(j); Calles Tr. 80-82; Felipe Tr. 128-33.

[13] 2012 Settlement Agreement § 2(k).  "Just Cause" was to be "determined by a majority of the Board in good faith, but shall include any negligence or breach of any agreement between the parties, or of any company rules or regulations." *Id.*

[14] *See* JX 30 at 92 (bankruptcy court order).

[15] Felipe Tr. 137, 168-69.

documents, including the 2008 LLC Agreement.[16] Felipe sought to update the 2008 LLC Agreement.[17]

On May 9, 2019, Felipe sent two emails to Fernando Calles, counsel for the Pegaso Equity Holders.[18] Each email attached an unsigned document titled "Amended & Restated Limited Liability Company Agreement of Caribevision TV Network, LLC," dated May 8, 2019 (the "2019 LLC Agreement").[19] The first email explained that the attachment was "the same document from February 20[0]8, only the specific points of the [2012] Settlement Agreement were added."[20] It attached a Word version with track changes.[21] The second email attached a PDF version of the 2019 LLC Agreement, which Felipe described as "clean."[22]

The 2019 LLC Agreement is not only substantially different from the 2008 LLC Agreement but also riddled with basic errors. The 2019 LLC Agreement, for example, references a "sole member," though the Company had multiple members

---

[16] *Id*. at 177-78.

[17] *Id*. at 138.

[18] JX 11; JX 12; Calles Tr. 6-7.

[19] JX 11; JX 12.

[20] JX 11 (English translation) 2. The email references "the same document from February 2018." *Id.* The reference to 2018 was a typo and meant to be 2008. *See* Calles Tr. 37.

[21] JX 11 at 3-27 (attachment).

[22] JX 12 (English translation) 2; *id.* at 3-21 (attachment).

at the time.[23] The 2019 LLC Agreement also mentions "shareholder" actions, though the Company had members—not shareholders.[24] Because Felipe's redline was run against a draft version of the 2008 LLC Agreement, other inconsistencies were not obvious from the markup.[25]

The 2019 LLC Agreement was never signed.[26] The Pegaso Equity Holders never negotiated with Felipe on the draft's terms.[27] And it was never adopted by the Company's members.[28]

### D. The Bankruptcy Proceedings

In May 2019, the Company and certain subsidiaries filed voluntary petitions for Chapter 11 bankruptcy before the United States Bankruptcy Court for the Southern District of Florida.[29] The proceeding was meant to restructure the companies' debt obligations while maintaining ongoing operations. Vasallo was authorized to make bankruptcy decisions for the debtors.[30]

---

[23] *Compare* JX 1 at 1, 4, 15, *with* JX 11 at 3, 5, 19 (discussing a "sole member"); *see* Felipe Tr. 125-26, 194.

[24] *See* JX 11 at 8 (Section 9.3(f)); Felipe Tr. 196.

[25] *See* Felipe Tr. 178-79 (testifying that the redline fails to identify other changes).

[26] *Id.* at 199.

[27] *See* Calles Tr. 41 (testifying that he had never seen a signed copy).

[28] JX 36 at 6-7; Felipe Tr. 208.

[29] *See In re Am.-CV Station Gp., Inc.* (*America-CV I*), 56 F.4th 1302, 1305-06 (11th Cir. 2023); PTO ¶ 13.

[30] *America-CV I*, 56 F.4th at 1306; PTO ¶ 14.

Under the Company's reorganization plan, the Pegaso Equity Holders were to receive a combined 65.8% of the equity interests in the Company.[31] The remaining 34.2% interests were to go to Vasallo TV.

On May 26, 2020, two days before the confirmation hearing, the debtors filed an emergency motion to modify the plan to give Vasallo TV 100% of the Company's membership interests. The motion was granted by the bankruptcy court on June 2 (the "Modification Order"), and Vasallo TV's proposed reorganization plan was confirmed on June 3.[32] The Pegaso Equity Holders moved for reconsideration, which was denied.[33]

On August 26, 2020, Vasallo TV executed another revised Amended and Restated Operating Agreement of Caribevision TV Network, LLC (the "2020 LLC Agreement").[34] This version reflected that Vasallo TV was the Company's sole member.

In January 2023, the United States Court of Appeals for the Eleventh Circuit held that the bankruptcy court erred in granting the Modification Order.[35] In May

---

[31] *America-CV I*, 56 F.4th at 1306; PTO ¶ 15.

[32] Calles Tr. 17-18, 26; *In re Am.-CV Station Gp., Inc.* (*America-CV II*), 657 B.R. 904, 912 (Bankr. S.D. Fla. 2024); PTO ¶ 17. Vasallo TV was also given 100% of the interests in Caribevision Holdings, Inc.

[33] PTO ¶¶ 18-19; *America-CV I*, 56 F.4th at 1307-08.

[34] JX 14; *see* PTO ¶ 20.

[35] PTO ¶ 21; *see America-CV I*, 56 F.4th at 1313-14.

2024, on remand, the bankruptcy court entered an order (the "Final Order") instructing the Company to issue equity interests to the Pegaso Equity Holders as contemplated by the bankruptcy plans before modification.[36] The Company was also directed to amend its operative limited liability company agreement to conform to the Final Order.[37]

### E.    The Written Consent and Meeting Notice

Consistent with the Final Order, Vasallo TV again changed the Company's governing document.[38] This document superseded the 2020 LLC Agreement and replaced it with the version "in effect prior to the Modification Order."[39] It reflected that the Pegaso Equity Holders had 65.8% of the Company's membership interests: 50.1% to Barroso, 11.9% to Pegaso TV, and 3.8% to Braun.[40] Vasallo TV held the remaining 34.2% interest.[41]

After their membership interests were restored on March 20, 2025, the Pegaso Equity Holders sought to regain control. They had been excluded from the Company's management for five years and lacked knowledge of its state of affairs.[42]

---

[36] PTO ¶ 24; JX 30 at 197-207.

[37] PTO ¶ 24; JX 30 at 206.

[38] PTO ¶ 27; JX 17.

[39] PTO ¶ 27; JX 17.

[40] *America-CV I*, 56 F.4th at 1306; PTO ¶ 27.

[41] *America-CV I*, 56 F.4th at 1306; PTO ¶ 27.

[42] Calles Tr. 22-23.

Unsure of which LLC agreement governed the Company, the Pegaso Equity Holders asked Felipe to confirm whether the 2019 LLC Agreement had been executed and to provide a copy if it had.[43] Felipe could not produce a final or executed copy of the 2019 LLC Agreement.[44] The Pegaso Equity Holders also requested Vasallo's cooperation in transferring control of the business to them.[45] Vasallo declined to do so voluntarily.[46]

The Pegaso Equity Holders then set out to secure operational control through their members' rights.[47] Two key events followed.

First, on April 11, 2025, the Pegaso Equity Holders executed an "Action by Written Consent of a Majority in Interest of the Members of Caribevision TV Network, LLC" (the "Written Consent").[48] The Written Consent purported to appoint Braun and Barroso as "Managers" serving on the Company's Management Committee, alongside Vasallo as the third Management Committee member.[49] It

---

[43] *See* JX 27; Calles Tr. 47.

[44] *See* JX 27; Calles Tr. 47.

[45] Calles Tr. 23.

[46] *Id.* at 22-24.

[47] *Id.* at 24.

[48] JX 18; *see* Calles Tr. 48.

[49] JX 18; *see* Calles Tr. 49 (testifying that Vasallo remained a member because he was designated by Vasallo TV and that Pegaso Equity Holders did not think they could replace him).

also purported to appoint Calles and Leonardo Zepeda as "Alternate Managers."[50] The Written Consent stated that it was subject to the 2019 LLC Agreement.[51]

Second, also on April 11, Braun and Barroso—acting as Managers—issued a notice of a regular Management Committee meeting.[52]  The notice stated that the meeting would take place 11 days later, on April 22, at 10:00 a.m. in Miami, Florida. Zoom information for remote participation was included.  The meeting notice was emailed to three attorneys for Vasallo TV.[53]

The notice attached proposed resolutions to be voted on at the April 22 meeting.  At a high level, the resolutions sought to remove Vasallo as the Company's Chairman, President, and CEO for "Just Cause."[54]  They also contemplated the appointment of new officers: Braun as the Chairman, President, and CEO, and Barroso as Secretary.  They stated that Braun, as the newly appointed CEO, would have the authority to manage the Company.[55]

---

[50] JX 18.

[51] *Id.*

[52] JX 19; *see* Calles Tr. 53.

[53] JX 19; JX 36 at 7-8.

[54] JX 19; *see supra* note 13 (defining "Just Cause").

[55] JX 19 at 3-5.

### F. The Management Committee Meeting

On April 22, 2025, the Management Committee met (the "Initial Meeting") at 10:00 a.m. Barroso and Braun, as well as Alternate Manager Calles, were in attendance.[56] No representative of Vasallo TV was present.[57]

After waiting to see if Vasallo would arrive, Barroso called the meeting to order around 10:10 a.m.[58] Calles, acting as Chair at Barroso's request, adjourned the meeting moments later after determining that a quorum was not present under the 2019 LLC Agreement.[59] He orally notified those in attendance that another meeting would take place shortly.[60]

Calles convened a second meeting about five minutes after adjourning the first (the "Subsequent Meeting").[61] The Managers discussed and voted to approve the resolutions that had been circulated with the April 11 Meeting Notice.[62]

After the Subsequent Meeting concluded, Pegaso TV's counsel sent Vasallo a letter reporting that the Management Committee had unanimously voted "to terminate [Vasallo] from [his] role as Chairman, President, and Chief Executive

---

[56] Calles Tr. 56-59.

[57] *Id.* at 58-59.

[58] *Id.* at 58.

[59] *Id.* at 58-59; *see infra* note 90 and accompanying text.

[60] Calles Tr. at 58-59.

[61] *Id.* at 59.

[62] JX 26; Calles Tr. 60-61.

Officer" due to "self-dealing" and "breaches of [his] fiduciary duties."[63]  He was also told that Barroso and Braun had been elected to officer roles.[64]  Felipe, on behalf of Vasallo TV, responded that the actions of the Management Committee were "void ab initio."[65]

Braun, believing himself to be the newly appointed CEO, attempted to enter the Company's premises after the April 22 meeting.  Police cars blocked his access. Felipe told Calles that if Braun entered the building, he would be arrested.[66]

### G.    This Litigation

On May 1, the Pegaso Equity Holders filed litigation in this court.[67]  At the same time, they moved for a status quo order.[68]  Given that Vasallo had been running the Company for the past five years, I permitted him to continue doing so until the litigation was resolved to minimize potential disruption.[69]

---

[63] JX 26 at 1-2.

[64] *Id.* at 2.

[65] JX 27 at 1.

[66] Calles Tr. 61-62.

[67] Verified Am. Compl. (Dkt 1) ("Compl.").

[68] *Id.*

[69] Status Quo Order (Dkt. 24) ¶ 2.

A one-day trial was held on July 17, 2025. Post-trial briefing followed.[70] I concluded that post-trial argument was unnecessary and took the matter under advisement.

## II.   ANALYSIS

This action is brought under 6 *Del. C.* §§ 18-110 and 18-111. The plaintiffs ask this court to issue declaratory judgments confirming their managerial control over the Company and Vasallo's removal as an officer.[71]

The issues to be resolved fall into three categories. First, I must determine whether the 2008 LLC Agreement, 2019 LLC Agreement, or default provisions of the Delaware Limited Liability Company Act (the "LLC Act") apply. Second, I must determine whether the Written Consent appointing Braun and Barroso as Managers was valid. And third, I must determine whether the actions taken at the Subsequent Meeting, including Vasallo's removal as an officer, were valid.

These issues, at bottom, turn on contract interpretation. Under Delaware law, a limited liability company "is primarily a creature of contract."[72] The members of a limited liability company "have wide contractual freedom to structure the company

---

[70] Pls.' Opening Post-trial Br. (Dkt. 60) ("Pls.' Opening Br."); Defs.' Post-trial Answering Br. (Dkt. 62) ("Defs.' Answering Br."); Pls.' Post-trial Reply Br. (Dkt. 64).

[71] Compl. ¶¶ 66-68.

[72] *See In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008).

12

as they see fit."[73]  The factual challenge is that two conflicting agreements are potentially in play.

I begin by determining that the 2008 LLC Agreement governs.  From there, I consider whether the relevant acts comply with the 2008 LLC Agreement.  Based on the 2008 LLC Agreement's plain terms, I conclude that the Written Consent is valid.  The actions taken at the Subsequent Meeting, however, fail for lack of notice.  Barroso and Braun are Managers, but Vasallo remains the Company's CEO.

## A.    The Operative LLC Agreement

Consistent with the bankruptcy court's Final Order, the 2020 LLC Agreement was replaced by "the Operating Agreement, as amended, in effect prior to the Modification Order."[74]  The parties dispute which version of the Company's LLC agreement was in effect before the Modification Order was granted.

Vasallo TV insists that the 2019 LLC Agreement is operative because the parties relied on it.  Alternatively, it asserts that the 2008 LLC Agreement governs.  The Pegaso Equity Holders, for their part, reject both versions—the 2019 LLC

---

[73] *Id.*; *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 487 (Del. 2024) ("Delaware is a contractarian state that holds parties' freedom of contract in high regard."); *In re Coinmint, LLC*, 261 A.3d 867, 889-91 (Del. Ch. 2021) (observing that Delaware's LLC law is "explicitly contractarian" and "fundamentally regards and enforces the limited liability company agreement as a contract").

[74] JX 17 at 1; *see* Felipe Tr. 128.

Agreement as lacking member assent, and the 2008 LLC Agreement as being too indefinite. They instead argue that the default provisions of the LLC Act apply.

### 1. The 2019 LLC Agreement

"[A] valid contract exists when (1) the parties intended that the instrument would bind them, demonstrated at least in part by its inclusion of all material terms; (2) these terms are sufficiently definite; and (3) the putative agreement is supported by legal consideration."[75] "Under Delaware law, overt manifestation of assent—not subjective intent—controls the formation of a contract."[76] Vasallo TV, as the proponent of the contract, failed to prove that the 2019 LLC Agreement is valid.[77]

Both the LLC Act and the 2008 LLC Agreement require unanimous member assent to effect an amendment to or adoption of a limited liability company agreement.[78] The 2019 LLC Agreement likewise considered a specific means of adoption: signature on the document.[79] Yet the record lacks any evidence that the

---

[75] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018).

[76] *Id.* (quoting *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014)).

[77] *REM OA Hldgs., LLC v. N. Gold Hldgs., LLC*, 2023 WL 6143042, at *26 (Del. Ch. Sept. 20, 2023) (explaining that the proponent of a contract has the burden of proving its existence), *aff'd*, 320 A.3d 237 (Del. 2024) (TABLE).

[78] JX 1 at 22; 6 *Del. C.* § 18-302(f).

[79] JX 12 at 19.

2019 LLC Agreement was signed by a Company member—or even that Pegaso TV supported it.[80]

Vasallo TV proffered documents to evidence that the 2019 LLC Agreement was, in fact, adopted.[81] Two are Felipe's May 9, 2019 emails to the Pegaso Equity Group that attach drafts of the 2019 LLC Agreement.[82] The emails only show that Vasallo TV wished to adopt the changes to the document, not that Pegaso TV assented.

The third document is a May 8, 2019 email from Felipe to Calles, Braun, and Vasallo attaching a slide deck.[83] The morning after receipt, Calles responded: "Marcell, lo revisamos."[84] The parties cannot agree on whether Calles's response is translated as "we'll review" or "we've reviewed."[85] Regardless, Calles was not confirming Pegaso TV's review of the 2019 LLC Agreement, which was circulated

---

[80] PTO ¶ 12; JX 36 at 6-7. Every other LLC agreement for the Company, by contrast, was executed by all then-members—even while Vasallo TV was acting as the sole member during the bankruptcy proceedings. *See* JX 1 at 29-30; JX 14 at 7; JX 17 at 1.

[81] *See* JX 35 (interrogatory responses) at 6.

[82] JX 11 at 1; JX 12 at 1.

[83] JX 13 at 3 (attaching "America-CV Entities Ownership Chart 3-9-2017.pptx").

[84] *Id.*

[85] Calles Tr. 44; Felipe Tr. 139-40. I give an edge to Calles' interpretation since he is the document's author.

15

hours later.[86] Even if Calles were confirming that Pegaso TV had reviewed the 2019 LLC Agreement, review is not assent.[87]

Vasallo TV correctly observes that, under Delaware law, a limited liability company agreement can be "written, oral or implied" and formed through the parties' conduct.[88] In effect, he believes that the Pegaso Equity Holders should be estopped from denying the 2019 LLC Agreement's validity because they relied on its unique provisions.[89] This argument has considerable force. Representatives of the Pegaso Equity Holders adjourned the Initial Meeting based on a special quorum rule that only exists in the 2019 LLC Agreement, indicating an intent to be bound.[90] The central question is whether the Pegaso Equity Holders' conduct reflects an implied adoption of the 2019 LLC Agreement, as Vasallo TV argues, or was a precautionary legal tactic, as the Pegaso Equity Holders insist.[91] To resolve it, I must weigh the fact of the Pegaso Equity Holders' reliance against the evidence that there

---

[86] *Compare* JX 13 at 2 (8:51 a.m. time stamp), *with* JX 11 at 2 (3:35 p.m. time stamp), *and* JX 12 at 2 (11:35 a.m. time stamp).

[87] *Compare Review*, Black's Law Dictionary (12th ed. 2024) (defining "review" as "[c]onsideration, inspection, or reexamination of a subject or thing."), *with Assent*, Black's Law Dictionary (12th ed. 2024) (defining "assent" as "[a]greement, approval or permission; esp., verbal or nonverbal conduct reasonably interpreted as willingness.").

[88] Defs.' Answering Br. 16 (quoting 6 *Del. C.* § 18-101(9)).

[89] *Id.* at 16-17 (arguing that since the bankruptcy proceeding began, all parties "have acted as if the 2019 [LLC] Agreement was the Company's governing document").

[90] JX 18 at 1; JX 26 at 1; *see infra* note 132 and accompanying text.

[91] *See infra* note 93 and accompanying text.

was never a "meeting of the minds" to finalize the agreement. Based on the record, I find that the Pegaso Equity Holders' explanation is credible given the parties' contentious legal history. Having just emerged from a lengthy legal battle where—in the words of the bankruptcy court—Vasallo TV had usurped control in bad faith, the Pegaso Equity Holders reasonably took a cautious approach.[92] Their attempt to comply with the most restrictive set of potential rules was a rational strategy to preempt the very procedural challenges Vasallo TV now raises. Calles persuasively testified to this rationale.[93]

Ultimately, though the Pegaso Equity Holders' reliance provides some support for Vasallo TV's position, it is far outweighed by countervailing evidence. The parties' pre-bankruptcy course of dealing was inconsistent with the 2019 LLC Agreement's terms.[94] More importantly, the numerous substantive drafting errors and the drafter's own email requesting approval are overwhelming proof that the 2019 LLC Agreement was neither final nor adopted by the Company's members.[95]

---

[92] *America-CV II*, 657 B.R. at 921 ("[T]he undisputed facts are clear that Mr. Vasallo did not act in good faith."). As noted above, the Pegaso Equity Holders had been cut out for five years and were unsure whether the 2019 LLC Agreement had ever been formally adopted. *See supra* note 42 and accompanying text.

[93] Calles Tr. 50, 99-100; *see infra* note 132 and accompanying text.

[94] For instance, the 2019 LLC Agreement contemplated a three-person Management Committee, excluding Alternate Managers. JX 12 at 10 (Section 11.4(a)). But Felipe confirmed that the pre-bankruptcy Management Committee had five members. Felipe Tr. 217.

[95] *See* JX 13 at 3 (English translation); *see supra* notes 23-24 and accompanying text.

This fact, combined with the 2019 LLC Agreement's express requirement of signatures for adoption, communicated to any reasonable negotiator that a contract had not been formed.[96]

### 2. The 2008 LLC Agreement

Unlike the 2019 LLC Agreement, the parties agree that the 2008 LLC Agreement was adopted by the Company's members, which executed the agreement.[97]  Although certain provisions were modified by the 2012 Settlement Agreement, the 2008 LLC Agreement was never annulled, canceled, or otherwise terminated.[98]  As Calles testified, if the 2019 LLC Agreement "had not been finalized, the last operative operating agreement for Caribevision TV Network would have been the 2008 [LLC Agreement]."[99]

Still, the Pegaso Equity Holders assert that the 2008 LLC Agreement cannot govern.  In their view, the 2008 LLC Agreement is too "out of date" and "incoherent" to be enforced, requiring the application of the LLC Act's default provisions.[100]  For a contract to be unenforceable for indefiniteness, its material terms must be so vague

---

[96] *See* JX 11 at 24 (version of the 2019 LLC Agreement requiring signatures for approval).

[97] *See* Pls.' Opening Br. 26; Defs.' Answering Br. 3-4; JX 1 at 24-25 (signature pages).

[98] Calles Tr. 64.

[99] *Id.* at 66.

[100] Pls.' Opening Br. 26-29.

that a court cannot ascertain the parties' intent or fashion a remedy for a breach.[101] The 2008 LLC Agreement is far from that standard.

The Pegaso Equity Holders' main basis for rejecting the 2008 LLC Agreement is its reference to a defunct "Stockholders Agreement" for the appointment of managers.[102] This argument improperly views the 2008 LLC Agreement in a vacuum. A limited liability company can be governed by a "combination of written agreements, oral agreements, and implied understandings."[103] The record shows that the Company's governance has evolved through a collection of contracts, with the 2008 LLC Agreement serving as the undisputed foundation. Built atop it was the managerial structure adopted by the 2012 Settlement Agreement, which expressly

---

[101] *See, e.g.*, *Cont'l Ins. v. Rutledge & Co.*, 750 A.2d 1219, 1230 (Del. Ch. 2000) ("Where terms in an agreement are so vague that a Court cannot determine the existence of a breach, then the parties have not reached a meeting of the minds, and a Court should deny the existence of the alleged agreement."); *Indep. Cellular Tel., Inc. v. Barker*, 1997 WL 153816, at *4 (Del. Ch. Mar. 21, 1997) ("The material terms of a contract will be deemed fatally vague or indefinite if they fail to provide a reasonable standard for determining whether a breach has occurred and the appropriate remedy." (citing Restatement (Second) of Contracts § 33(2) (A.L.I. 1981)).

[102] Pls.' Opening Br. 27 (quoting JX 1 at 10).

[103] *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 660 n.87 (Del. Ch. Sept. 19, 2022), *aff'd in part, rev'd in part and remanded*, 304 A.3d 896 (Del. 2023); *see also Robinson v. Darbeau*, 2021 WL 776226, at *9 (Del. Ch. Mar. 1, 2021) ("Under the LLC Act, however, such an agreement may be 'written, oral, or implied.' The options are not mutually exclusive—an agreement may be 'partly written, partly oral and/or partly implied.'" (citations omitted)); 6 *Del. C.* § 18-101(9).

modified certain terms of the 2008 LLC Agreement that conflicted with the 2012 Settlement Agreement.[104]

Moreover, none of the provisions of the 2008 LLC Agreement that apply to the disputed corporate acts are outdated or incoherent.[105] The referenced Stockholders Agreement is irrelevant after the Final Order, which set the parties' membership interests. If an agreement addresses the issue in dispute, its terms "control[] unless [they] violate[] one of the [LLC Act's] mandatory provisions."[106] To ignore the clear terms of the 2008 LLC Agreement based on a single, defunct provision would undermine Delaware's foundational policy favoring freedom of contract in alternative entities.[107]

Accordingly, I reject the Pegaso Equity Holders' invitation to discard an executed contract in favor of statutory defaults because certain of its provisions are

---

[104] *See* Calles Tr. 82-83 (testifying that the 2012 Settlement Agreement made "certain changes to the . . . 2008 operating agreement"). The 2008 LLC Agreement permits amendments in writing "executed by all of the then existing Members." JX 1 at 22 (Section 25). The 2012 Settlement Agreement was executed by all the Company's then-members. JX 2 at 9-12.

[105] The provision raised by the plaintiffs concerns the number of managers who may be appointed in accordance with the Stockholders Agreement. JX 1 at 10 (Section 11.4(a)). At issue, however, is whether the appointment by written consent was valid, which concerns a separate provision of the 2008 LLC Agreement.

[106] *Coinmint*, 261 A.3d at 900-01; *see also XRI Inv. Hldgs.*, 304 A.3d at 923.

[107] *See, e.g.*, *Achaian, Inc. v. Leemon Fam. LLC*, 25 A.3d 800, 802 (Del. Ch. 2011) (stating that "the Delaware Limited Liability Company Act [is] an enabling statute whose primary function is to fill gaps, if any, in a limited liability company agreement").

stale. The 2008 LLC Agreement, as modified by the 2012 Settlement Agreement, is a sufficiently definite and enforceable contract that governs the matters at hand.[108]

## B. The Written Consent

Having concluded that the 2008 LLC Agreement governs, I next consider whether the Written Consent validly elected Barroso and Braun to the Management Committee. My analysis hinges on the plain terms of the 2008 LLC Agreement. In reviewing the 2008 LLC Agreement, I apply settled principles of contract interpretation.

"Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party."[109] "When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language."[110] The court "will read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."[111] "Moreover,

---

[108] *See* 2008 LLC Agreement § 25 ("Any amendment to this Agreement shall be adopted and be effective as an amendment hereto if it is executed by all of the then existing Members, if more than one."); 2012 Settlement Agreement § 2(d) (stating that the "Operating Agreement" was amended to the extent it was inconsistent with the 2012 Settlement Agreement).

[109] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[110] *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021).

[111] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397-98 (Del. 2010).

21

'in giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract.'"[112]

### 1. Section 11.4(b)

Delaware law gives limited liability company members maximum contractual freedom to structure the entity's internal governance.[113] Section 18-302(d) of the LLC Act states that "*[u]nless otherwise provided* in a limited liability company agreement . . . the members" may act without a meeting or vote "if consented to or approved, in writing . . . by members having not less than the minimum number of votes that would be necessary to authorize or take such action."[114] Section 11.4(b) of the 2008 LLC Agreement outlines a procedure for electing Managers:

> *The Management Committee shall be appointed at the annual meeting of the Members* and each Manager and Alternate Manager shall hold office for a term of one (1) year or until his death, resignation or removal, and his successor is elected and qualified. Any Manager or Alternate Manager may resign at any time by giving at least five (5) business days written notice to the Company and the other Managers. Each Manager and Alternate Manager appointed to fill a vacancy shall hold office until the expiration of the term of office of the Manager or Alternate Manager whom he or she has replaced or until his or her

---

[112] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (quoting *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 913-14 (Del. 2017)).

[113] *See* 6 *Del. C.* §§ 18-101(7), -302, -402.

[114] 6 *Del. C.* § 18-302(d) (emphasis added).

22

successor is appointed and qualified by a Majority in Interest of the appropriate voting class(es).[115]

Based on the first phrase of Section 11.4(b), Vasallo TV contends that Managers can be appointed only by members once a year at an annual meeting. But its interpretation exists in a vacuum. When read with other provisions of the 2008 LLC Agreement, it becomes apparent that Section 11.4 merely sets a default procedure by which elections of Managers may occur. That procedure is not, however, exclusive.[116]

### 2. Sections 9.1 and 9.2

The Company's members, acting by a majority in interest, are permitted to set their own procedures, including to act by written consent in lieu of a meeting—annual or otherwise.[117] Under Section 9.1 of the 2008 LLC Agreement, "[n]o decision of the Members shall be made except upon the affirmative vote of a Majority in Interest of the Members."[118] A "Majority in Interest" means members

---

[115] 2008 LLC Agreement § 11.4 (emphasis added).

[116] There is a distinction between default procedures and exclusive, mandatory rules. For example, Section 11.4 does not say that Manager elections "shall *only* be appointed at the annual meeting" or that "no appointments shall be made except at the annual meeting." *Cf. Manti Hldgs.*, 261 A.3d at 1222 ("The best way to save investors the trouble of determining whether a corporation departed from a default rule [of the DGCL] would be to make that rule mandatory . . . ."); *Coinmint*, 261 A.3d at 901.

[117] The term "annual meeting" is not defined in the 2008 LLC Agreement. Unlike its corporate analog, the LLC Act does not distinguish annual meetings from other meetings. *Compare* 8 *Del. C.* § 211(a), *and* (c), *with* 6 *Del. C.* § 18-302(c).

[118] 2008 LLC Agreement § 9.1.

"whose aggregate Percentage Interests represent more than fifty percent (50%) of the aggregate Percentage Interest of all such Members."[119] "Percentage Interest" means "the percentage of a Member's Interest when compared to all Members' Interests."[120]

Section 9.1 expressly allows members to act "by a written consent or other document signed by a Majority in Interest of the Members entitled to vote thereon" in lieu of a meeting.[121] This ability is reinforced by Section 9.2, which allows a "Majority in Interest of the Members" to establish the procedure for how meetings are conducted, except for the specific limits outlined.[122] Section 9.2 also provides an unlimited and unqualified right "to introduce agenda items for each meeting."[123]

Neither Section 9.1 nor Section 9.2 carve out annual meetings. Their terms apply broadly to any sort of member meeting. Members with a majority of the Company's interests are empowered to act—including by appointing Managers—

---

[119] *Id.* § 1.

[120] *Id.* "Interest" means "a Member's share of the allocations of the Company's profits and losses." *Id.*

[121] *Id.* § 9.1.

[122] *Id.* § 9.2 ("A Majority in Interest of the Members shall establish all other provisions relating to meetings of Members . . . .").

[123] *Id.*

without a meeting if they so choose. This ability tracks Section 18-302(d) of the LLC Act.[124]

### 3. Reading Sections 11.4(b), 9.1, and 9.2 Together

Vasallo TV responds that the specific requirement of Section 11.4(b) controls over the general language of Sections 9.1 and 9.2.[125] Section 11.4(b) contains a specific requirement for appointing Managers "at the annual meeting."[126] Sections 9.1 and 9.2, by contrast, apply to *any* decision by written consent. As such, Vasallo TV insists that Braun and Barroso's attempt to appoint Managers via written consent was invalid because they failed to follow the specific procedure required for that action.

"Specific language in a contract controls over general language, and where specific and general provisions *conflict*, the specific provision ordinarily qualifies the meaning of the general one."[127] But the provisions at issue do not necessarily conflict; they can be read together harmoniously. "[W]here a contract provision

---

[124] 8 *Del. C.* § 18-302(d); *see supra* note 114 and accompanying text. If the 2008 LLC Agreement were too indefinite to be enforced, then this default provision would apply, and the Written Consent would remain valid.

[125] Defs.' Answering Br. 22.

[126] 2008 LLC Agreement § 11.4(d).

[127] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) (emphasis added).

25

lends itself to two interpretations, a court will . . . adopt the construction that is reasonable and that harmonizes the affected contract provisions."[128]

This approach is both sensible and reasonable. Section 11.4(b), on the one hand, states *what* happens at an annual meeting: Managers are appointed. It establishes a default event and purpose. Sections 9.1 and 9.2, on the other hand, address *how* decision-making occurs, giving a majority of the members broad and unqualified power to make decisions at a meeting or by written consent. A majority of members can use the procedural tool of written consent to accomplish a task (appointing Managers) without holding an annual meeting.

This harmonious reading is further supported by the policy of contractual freedom underpinning the LLC Act. The right of a majority in interest to act by written consent is a powerful governance tool granted by the 2008 LLC Act, as well

---

[128] *Axis Reinsurance v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010); *see also Comcast Cable Commc'ns Mgmt., LLC v. CX360, Inc.*, 2024 WL 5251997, at *11 (Del. Ch. Dec. 31, 2024) ("Though they are an awkward fit, the provisions can be read harmoniously such that Section 12 is not in conflict with the bilateral termination for convenience right in Schedule A.3.").

as a default right under the LLC Act itself. To adopt Vasallo TV's rigid interpretation would ignore the plain language of Sections 9.1 and 9.2.

*     *     *

The Pegaso Equity Holders are a "Majority in Interest" of the members with the authority to elect Managers.[129] They chose to elect Managers by written consent, as permitted by the 2008 LLC Agreement and the LLC Act, rather than at an annual meeting. The Written Consent complies with the 2008 LLC Agreement. Thus, Braun and Barroso were validly elected as Managers, and Zepeda and Calles as Alternate Managers.[130]

### C. The Management Committee Meeting

The remaining question is whether the Management Committee validly acted on April 22, 2025. It did not. Although Barroso and Braun were entitled to call a Management Committee meeting, they failed to abide by the 2008 LLC Agreement's notice requirement after one meeting was adjourned and a second meeting commenced.

---

[129] PTO ¶¶ 1-3.

[130] JX 18. The Pegaso Equity Holders were not obligated to provide formal notice to the Company of an act taken by the members without a meeting, including sending a copy of the Written Consent to Vasallo. Neither the 2008 LLC Agreement nor the LLC Act (6 *Del. C.* § 18-302(d)) impose that requirement.

27

The Pegaso Equity Holders' own representative, Calles, testified that as Chair, he decided to adjourn the Initial Meeting "for lack of quorum" because no one from Vasallo TV was present.[131]  He was erroneously operating under a strict quorum requirement in the 2019 LLC Agreement.[132]  No such requirement exists in the 2008 LLC Agreement.[133]

Having acted under the assumption that the strict quorum rule from the 2019 LLC Agreement applied, the Managers in attendance then ignored the notice requirement for the Subsequent Meeting.  The April 22 meeting was called as a regular meeting.[134]  Section 11.2(b) of the 2008 LLC Agreement states:

> No notice shall be required for any regular meeting of the Management Committee, but a copy of every resolution fixing or changing the time or place of regular meetings shall be mailed to every Manager and Alternate Manager at least ten (10) days before the first meeting held in pursuance thereof.[135]

Vasallo was given no notice of the Subsequent Meeting.[136]

---

[131] Calles Tr. 58-59.

[132] *See* 2019 LLC Agreement § 11.2(d).

[133] The Pegaso Equity Holders argue that a quorum was technically present for the Initial Meeting under the 2008 LLC Agreement.  Pls.' Opening Br. 40-41; *see* 2008 LLC Agreement § 11.2(d) (stating that a "majority of the Managers (including for this purpose any Alternate Manager participating in the meeting in place of an absent Manager) in office shall constitute a quorum for the transaction of business").  Regardless, the Initial Meeting was adjourned, and no matters were voted upon.

[134] JX 26 at 1, 3-5.

[135] 2008 LLC Agreement § 11.2(b).

[136] Calles Tr. 101-02; Felipe Tr. 155.

Thus, the Subsequent Meeting contravened the 2008 LLC Agreement and the actions taken during it are defective.[137] Without the required notice to all Managers, the resolutions passed during it are voidable.[138] No efforts were made to validate the

---

[137] This result admittedly appears hyper-technical. But notice is a fundamental, substantive right in corporate governance, ensuring that all managers have a meaningful opportunity to participate in significant decisions. *Cf. Lippman v. Kehoe Stenograph Co.,* 11 Del. Ch. 80, 88 (1915) ("Each member of a corporate body has the right to consultation with [] others and has the right to be heard upon all questions considered . . . ."). This principle is particularly vital here, where the resolutions passed at the un-noticed Subsequent Meeting sought to remove the Company's CEO for cause. *Cf. id.* ("[I]t is presumed that if the absent members had been present, they might have dissented and their arguments might have convinced the majority of the unwisdom of their proposed action . . . ."). If I were to adopt the Pegaso Equity Holders' argument that no notice was required, the notice rights of an absent Manager would effectively be nullified. The original, proper notice pertained only to the Initial Meeting, which was formally adjourned. A new meeting requires new notice. Upholding this bargained-for procedural protection is a core tenet of Delaware's contractarian approach to alternative entities.

[138] "The essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are ultra vires, fraudulent or gifts or waste of corporate assets. The practical distinction . . . is that voidable acts are susceptible to cure by shareholder approval while void acts are not." *Michelson v. Duncan*, 407 A.2d 211, 218-19 (Del. 1979). Here, the defective act falls in the former category. *Cf. Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch. 2005), *aff'd*, 884 A.2d 512 (Del. 2005) (holding that defective notice for a meeting renders acts that were otherwise lawful as "voidable actions susceptible to cure by member approval and to the defense of estoppel"); *XRI Inv. Hldgs.*, 282 A.3d at 667 ("[A]lthough there is a split of authority on the issue, cases have held that an action taken in violation of a bylaw is subject to ratification or to the invocation of equitable defenses."); *id.* (discussing why an "action taken in violation of a bylaw" should be deemed "voidable, not void (as long as it was action that the corporation otherwise had authority to take under the DGCL and in compliance with its certificate of incorporation)").

Management Committee's actions.[139]  Those acts are therefore invalid and presently lack legal effect.

## III.    CONCLUSION

Judgment is entered for the plaintiffs in part, and for the defendants in part. The 2019 LLC Agreement was never adopted as the Company's limited liability company agreement.  The 2008 LLC Agreement, clarified by the 2012 Settlement Agreement, continues to govern the Company.  Braun and Barroso were properly appointed to the Management Committee through the Written Consent.  But the resolutions passed at the Subsequent Meeting are defective for lack of notice. Vasallo remains the President, CEO, and Chairman of the Company; Braun was not installed to those positions; and Barroso was not appointed Secretary.

---

[139] For example, the Management Committee could have voted to approve the resolutions at a new, properly noticed meeting.